**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | CATHERINE GONZALEZ, | : | Chapter 13 |
| | | : | |
| | Debtor. | : | Bky. No.  15-10628 ELF |

# O R D E R

**AND NOW**, the court having held a hearing on **August 23, 2016** to consider confirmation of the Debtor's Seventh Amended Chapter 13 Plan ("the Plan") (Doc. # 107), the objection thereto of Jian Zhu Lin ("Lin") and dismissal of this case under 11 U.S.C. §1307(c);[1]

**AND**, the court concluding that the Plan is not feasible, see 11 U.S.C. §1325(a)(6);

It is therefore **ORDERED** that:

1. Lin's objection to confirmation of the Plan is **SUSTAINED**.

2. Confirmation of the Plan is **DENIED**.[2]

3. This bankruptcy case is **DISMISSED**.[3]

Date: September 8, 2016

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**

# E N D   N O T E S

1.      See ¶ 5 of the Order dated July 12, 2016, (Doc. # 104).


2.      Lin was the successful bidder at the tax sale of the Debtor's real property and is its current record owner.  The Debtor's Plan proposes to treat the payment necessary to effect a redemption of the property under 53 P.S. §7293 as an allowed secured claim in accordance with the prior opinions and orders in this case.  See In re Gonzalez, 2016 WL 3749395 (Bankr. E.D. Pa. July 12, 2016) ("Gonzalez II"); In re Gonzalez, 550 B.R. 711 (Bankr. E.D. Pa. 2016).

　　　　The Plan is to be funded, in part, by payments to the chapter 13 trustee ("the Trustee") totaling **$64,160.46**.  The Plan states that money presently held by the Sheriff of Philadelphia County will provide the balance of the money necessary to fund the Plan.

　　　　The Debtor proposes to fund the **$64,160.46** in trustee payments as follows: in addition to the **$6,882.00** already paid to the Trustee prior to the filing of the Plan (an average of approximately **$382.00** per month since the commencement of the case in **January 2015**), the Debtor will make **42 monthly payments** of **$1,363.77**, an increase of almost **$1,000.00** per month.

　　　　At the **August 23, 2016** confirmation hearing, Lin acknowledged that the Plan is adequately funded, i.e., it proposes to pay Lin the sums required by 11 U.S.C. §1325(a)(5)(B). Also, Lin did not question the availability of the money held by the sheriff, to be used in the Plan. She does contend that the Debtor lacks adequate income to make the monthly payments to the Trustee.  Thus, Lin's sole objection is that the Plan is not feasible.  See 11 U.S.C. §1325(a)(6).

　　　　No other party has objected to confirmation.  At the conclusion of the confirmation hearing, the Trustee, with some reluctance, recommended that the Plan be confirmed.

　　　　As the plan proponent, the Debtor has the burden of proving that her plan meets all of the confirmation requirements in 11 U.S.C. §1325(a).  See, e.g., In re Orawsky, 387 B.R. 128, 148 n.33 (Bankr. E.D. Pa. 2008) (citing cases).  Section 1325(a)(6) provides that confirmation of a chapter 13 plan requires a finding that "the debtor will be able to make all payments under the plan and to comply with the plan."

　　　　The feasibility requirement of §1325(a)(6) is designed to preclude the confirmation of "visionary or speculative" chapter 13 plans.  In re Soppick, 516 B.R. 733, 748 (Bankr. E.D. Pa. 2014 (per Fox, J.) (citing cases).  To satisfy §1325(a)(6), the plan must have a "reasonable likelihood of success," i.e., the debtor must appear to have the necessary resources to make all the payments required by the plan.  Commonly, debtors meet this burden by showing stable

income at a level sufficient to make the required plan payment, after taking into account the debtor's living expenses.  See id. at 749; accord In re Rowe, 239 B.R. 44, 53-54 (Bankr. D.N.J. 1999); In re Williams, 1998 WL 2016786, at *2 (Bankr. D.S.C. Jan. 13, 1998).

I find that the Debtor has not satisfied the feasibility standard.

As I observed in Gonzalez II, 2016 WL 3749395, at *9, the Plan has an unusual feature. While the Debtor seeks to redeem the residential property sold at a tax sale, she no longer resides in the property.  Further, she does not contend that she personally has sufficient income to fund the prospective **$1,363.77** per month plan payment to the Trustee.  Instead, she posits that her aunt and uncle, Edward and Aida Roldan, who have resided in the property for many years, will make the trustee payment and pay all of the property expenses – essentially, in lieu of rent. Thus, the **August 23, 2016** confirmation hearing focused almost exclusively on the Roldans' family economy.

The Debtor and Mr. Roldan posit that Mr. Roldan's income is adequate to support the **$1,363.77** monthly trustee payment.  They contend that his net pay, after payment of living expenses, leaves **$565.00** per month available for the trustee payment, leaving them **$798.77** short of the monthly plan payment.  They propose to fund the **$798.77** shortfall in a novel way:

> (a) Mr. Roldan will increase his weekly 401(k) deduction to **$98.28**, which his employer will match dollar-for dollar, resulting in a 401(k) contribution of **$196.56** per week (an amount that will exceed **$800.00** per month on average, based on the fact that there are 52 weeks each year, or an average of 4.3 weeks per month, a methodology I will use below to convert weekly amounts to monthly amounts); and
>
> (b) Mr. Roldan will withdraw these contributions (presumably monthly and without penalty because he is older than 59 ½ ) in order to pay the balance of the plan payment.

In other words, Mr. Roldan proposes to leverage his participation in his employer's 401(k) plan to effectively increase his base pay from his employer, transforming retirement contributions into immediately available, disposable income to be used to fund the Debtor's plan.

Based on the preponderance of the evidence, I find that this plan funding mechanism lacks a reasonable likelihood of success because the Roldans' income is insufficient.

I make this finding without even reaching the question whether Mr. Roldan is entitled to use his 401(k) plan in the unorthodox manner proposed.  Even assuming that he can draw approximately **$800.00** each month from the retirement plan, I am unconvinced that, after accounting for living expenses, Mr. Roldan can afford to pay the Trustee **$565.00** per month from his net pay.

The evidence presented regarding the Roldans' household economy was not precise. But, certain things were clearly established by the evidence.

Shortly before the hearing, the Debtor (and the Roldans) made the initial, higher plan payment of **$1,363.77**. Mr. Roldan is 61 years old. He is the sole breadwinner in his household; Mrs. Roldan does not work. Mr. Roldan has been employed for approximately six (6) years by Global Packaging, Inc. as an hourly worker. He earns **$21.00** per hour. His employment hours vary, which causes his income to fluctuate to some extent.

Mr. Roldan presented five (5) weekly pay stubs, mostly in the month of June 2016, plus one (1) pay stub in July 2016. (Exs. D-1, D-4). These pay stubs provide useful information regarding Mr. Roldan's gross pay, payroll deductions and net pay.

The five (5) pay stubs showed that the number of hours Mr. Roldan worked each week varied: 36 hours, 40 hours (twice), 44 hours and 48 hours. His gross weekly pay ranged from **$756.00** to **$1,092.00**. His year-to-date gross pay through **July 23, 2016** (which represents 30 weekly pay periods) was **$25,554.19**, or an average of **$851.80** per week. I find this average to be the best prognosticator of Mr. Roldan's future gross wages. This projects out to **$3,662.74** per month.

The pay stubs show typical deductions from Mr. Roldan's gross wages:

- withholding taxes,
- health and dental insurance,
- life insurance,
- disability insurance,
- repayment of a 401(k) loan, and
- a contribution to a 401(k) plan.

Mr. Roldan's year-to-date payroll deductions for taxes totaled **$5,195.55** through **July 23, 2016**, or an average of **$173.19** per week, or **$744.71** per month.

Mr. Roldan's non-tax payroll deductions on the five (5) pay stubs offered into evidence ranged from **$325.07** to **$370.43**. The year-to date total of those deductions – excluding the last pay stub, in which Mr. Roldan increased his 401(k) contribution – was **$9,236.06**. Using 29 pay periods (for reasons, I will explain just below), this is an average of **$318.48** per week.

I give separate attention to the 401(k) deduction because that is a deduction Mr. Roldan proposes to increase in order to fund the chapter 13 plan. In the 29 pay periods preceding the **July 23, 2016** pay period, Mr. Roldan made 401(k) contributions totaling **$1,564.39**, an average of **$53.94** per week. He proposes to increase that deduction to **$98.28**, or an additional **$44.34** per week. Based on that increase, I will add **$44.34** to Mr. Roldan's 29-week average non-tax payroll deduction of **$318.48** to arrive at the projection that his weekly non-tax payroll

-4-

deductions will be **$362.82** per week, or **$1,560.13** per month.

Based on the above findings, I calculate Mr. Roldan's likely <u>**net monthly take-home pay**</u> as follows:

| | |
|---|---|
| **average gross wages** | $ 3,662.74 |
| **average payroll deduction (tax)** | ($ 744.71) |
| **average payroll deduction (non-tax)** | ($ 1,560.13) |
| **Average Monthly Net Pay** | $ 1,357.90 |

In his testimony, Mr. Roldan projected the following average monthly living expenses:

| | |
|---|---|
| **food** | $ 250.00 |
| **electric** | $ 95.00 |
| **water** | $ 85.00 |
| **cable** | $ 100.00 |
| **auto (operating expenses)** | $ 110.00 |
| **auto insurance** | $ 86.00 |
| **medical** | $ 30.00 |
| **entertainment** | 0.00 |
| **clothing** | 0.00 |
| **real estate taxes** | $ 150.00 |
| **Total** | $ 906.00 |

Even accepting these projections, the Roldans cannot afford to pay **$565.00** each month from Mr. Roldans' net pay: **$1,357.90** minus **$906.00** equals **$451.90**. This is insufficient.

My conclusion is reinforced in three (3) ways.

First, I am unconvinced that the stated budget is realistic. It is far more likely that the Roldans' monthly expenses for certain line items are understated – particularly, the line items for food, electric, entertainment and clothing.

Further, this budget does not account for two (2) additional expenses that are substantial (in relative terms to this household economy): (1) home repair/maintenance costs and (2) additional federal income taxes that will fall due on the (approximate) additional **$800.00** per month in income that Mr. Roldan proposes to draw from his 401(k) plan. Indeed, while the record is not developed on the subject, it is entirely possible that as much as 20% may be withheld for federal taxes from each distribution Mr. Roldan proposes to take from his 401(k) account. If so, from a simple cash flow perspective, his plan will not work. But even if the taxes are not withheld, he is obligated to pay those taxes and would need to set aside those funds, leaving him with less income to pay living expenses and the plan payment. In any event, these two (2) additional expenses easily could average at least another **$300.00** each month, making it

even more likely that the Roldans will be unable to make the proposed **$565.00** monthly payment to the Trustee.

Finally, viewing the proposed budget from the perspective of the proverbial "30,000 feet," it is apparent how infeasible it is. If I consider the **$800.00** per month draw from the 401(k) simply as part of their monthly income, the Roldans have **$2,157.90** available to spend each month. From that income, they are proposing to spend **$1,365.00** on the equivalent of debt service for their housing. This represents about **63%** of their monthly income. My experience tells me that this is not sustainable in the long run.

3.  See Gonzalez II, 2016 WL 3749395, at *7 n.26.